THE CITY OF CHICAGO, Plaintiff-Appellee, v. ASPHALT RECOVERY SYSTEMS, INC., *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 1—91—2434

Opinion filed June 17, 1992.

Michael Null, of Chicago, for appellants.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, Kathleen Hennessey, William Chamberlain, and Jean Dobrer, Assistant Corporation Counsel, of counsel), for appellee.

JUSTICE CERDA delivered the opinion of the court:

Defendants, Asphalt Recovery Systems, Inc., an Illinois corporation (ARS), and Michael M. Gaudio, appeal from the entry of a preliminary injunction against them in favor of plaintiff, the City of Chicago. Defendants argue that the trial court erred in enjoining them from continuing to accept used asphalt roofing and related material for recycling into cold patch and other products. Defendants argue that they were not operating a waste dump because none of the material present on their property constituted "waste" within the meaning of the applicable environmental ordinance. We affirm.

The Chicago Zoning Ordinance, which is title 17 of the Chicago Municipal Code (the Code), provides for "planned developments," the stated purpose of which is to create districts for specialized purposes. (Chicago Zoning Ordinance §11.11 (1992).) The City Council of Chicago amended Map No. 12—G of the Chicago Zoning Ordinance (Chicago Zoning Ordinance, Map 12—G (1992)) to change the zoning of defendants' property to a "Manufacturing Planned Development" (MPD). (Chicago City Council Journal, December 6, 1987, at 7554-57.) According to this MPD ordinance:

"3. All applicable official reviews, approvals and permits required shall be obtained by the Applicant.

\* \* \*

5. The uses of the area delineated as Manufacturing Planned Development will consist of structures, facilities and equipment for the recycling of asphalt materials, paperboard materials, and other recyclable materials, including outdoor storage of such materials, and the cleaning, bundling, compacting, packing and other processing of such materials for use as a new material in a manufacturing process or reuse as consumer products. The structures, facilities and equipment will be devoted to the storage and recycling of materials containing asphalt and other recyclable materials and the activities related to the operation of a Class II Recycling Facility, in compliance with all applicable performance standards for an M2—2 General Manufacturing District." Chicago City Council Journal, December 6, 1987, at 7555.

Plaintiff's complaint for injunctive and other relief alleged the following. ARS leased the property at 4835 S. Morgan Street with the stated intention of carrying on a business of recycling used asphalt shingles. Since about 1986, defendants used the property as a dump site for used asphalt shingles, construction debris, tires, and other

waste material. Defendants permitted private waste haulers to dump material on the property after the payment of a fee based on the number of cubic yards of waste material. The dumped waste material covered an area of about seven acres in area and 20 feet in height. Defendants had been attempting to create a mechanical process for recycling the shingles by grinding them up into reusable asphalt, but the efforts at perfecting a recycling method had not been successful. Defendants had not sold recycled asphalt, and their income was almost exclusively made from the dumping fees paid by private waste haulers.

Plaintiff further alleged in count I that defendants' creation of a dump violated section 17—6.2 (now section 11—4—1500) of the Chicago Municipal Code (the Code):

> "No solid or liquid waste shall be treated or disposed of within the city of Chicago except in accordance with this chapter. ***
>
> * * *
>
> No persons shall (1) cause or allow the open dumping of any waste, (2) abandon or dispose of any waste upon public property, except in a sanitary landfill approved by the Illinois Environmental Protection Agency and the Commissioner, (3) dispose, treat, abandon or transport any waste, except at a site or facility which meets the requirements of the Illinois Environmental Protection Act and which is permitted pursuant to this chapter.
>
> Disposal or treatment of any waste without a permit is hereby declared to be a nuisance." (Chicago Municipal Code §11—4—1500 (1990).)

Defendants had not obtained any annual permits for the dumping of waste on their property. Nor had defendants obtained a permit from the Illinois Environmental Protection Agency to operate a waste disposal facility. In count II, plaintiff alleged that the business' continued operation was a public nuisance.

Plaintiff requested the following relief: (1) preliminary and permanent injunctions enjoining defendants from dumping any further waste material on their property; (2) preliminary and permanent injunctions requiring defendants to remove all the waste material dumped on the property; and (3) a $500 fine for each day that waste material was deposited and allowed to remain on the property without a permit.

Plaintiff next filed a motion for a temporary restraining order and/or a preliminary injunction enjoining defendants from dumping

any further waste material on the property. Plaintiff argued that the dump site was operated in violation of section 11—4—1500 and was a public nuisance.

Defendants admitted in response to a request to admit that as of June 1, 1991, they received fees known as "tipping fees."

David Inman, the deputy commissioner of plaintiff's Environment Protection Division of the Department of Consumer Services, testified to the following at the hearing. He visited defendants' property and observed a large amount of roofing material with other materials mixed in, including plastic, wood, and nails. On a second visit, he observed a larger quantity of material on the site. The entire property was about seven acres, and the material on the site covered about four to five acres. The height of the material was about 25 or 30 feet. From April 1987 through June 1991, close to 251,000 cubic yards of the material was collected. The material on the site belonged to defendants, and he had no reason to believe that the material was abandoned.

Inman further testified that there was a building and machinery on defendants' property that was intended for the crushing, shredding, and separating of the material in order to make a ground asphalt type of material, which could be used as raw product in the production of the final product of cold patch. Cold patch was material used to patch potholes and to "cut sleeves" in alleys and streets. From August 1990 through June 1991, defendants produced 6,541 tons of cold patch. ARS did not have a recycling license.

Jeffery A. Ferg, an environmental engineer for plaintiff, testified to the following. On a recent visit to the site, he observed stockpiled roofing debris containing asphalted shingles, asphalted tar, different compounds used in roofing work, metallic sheeting, metal shards, tin, plastic, wood, brick, concrete, and foam insulation. The material was in a continuous pile so that there was no access to it, and there were no fire lanes. If there were a fire, it would create a significant hazard to anyone living downwind of the site, and the material would generate a significant amount of air pollution. There was a risk of the asphalt material leaching into the soil or the groundwater. Soil from the site was analyzed, and the results found significant levels of arsenic, selenium, lead, other heavy metals, and polynuclear aromatics. At a rate of 200 tons a day and a 40-hour work week for 50 weeks in a year, it would take 10 years to process the 255,000 tons of the material present on the site.

Defendant Michael M. Gaudio, ARS' president, testified to the following. Defendants started producing cold patch in August 1990.

Defendants also produced ground roofing, and 15,000 tons of ground roofing had been ground at the site.

Phillip B. Shepard testified to the following. His past employment involved research concerning asphalt recycling. Defendants had a viable manufacturing operation, and the site was not a hazard.

After the hearing, the trial court preliminarily enjoined defendants from receiving any used asphalt shingles, roofing waste, construction debris, or any other waste for disposal, storage, or recycling. Defendants appeal from that ruling.

Defendants argue that the trial court erred in entering the preliminary injunction because none of the material at the site was waste and because ARS was not operating a waste dump. Specifically, defendants argue that: (1) ARS was storing raw material for its process, which it was authorized to do by the MPD; (2) the stored material was recyclable material, according to the MPD; (3) plaintiff's own deputy commissioner testified that the material belonged to defendants, so that the abandonment element of the definition of waste was not satisfied; (4) the specific MPD ordinance controlled over the more general provisions of the environmental control ordinance, which did not include asphalt within its definition of recyclable materials; and (5) the MPD ordinance should be construed together with the environmental control ordinance, under the *in pari materia* doctrine, because they related to a common subject.

Plaintiff argues that the asphalt and other debris at the site constituted waste and that defendants were operating a waste dump because: (1) the material was abandoned or discarded; (2) asphalt roofing debris was not listed as a recyclable material in the Code; (3) common sense required the conclusion that 255,000 tons of any material that had been dumped over five years on an open lot and that would take 10 years to process constituted waste; (4) the Code limited to 60 days the length of time that recyclable material may be stored; (5) the material was waste "under any definition" because of its volume and the long time it had been accumulating; (6) material that was discarded by haulers before being recycled could not be treated like material that was recycled as part of an ongoing manufacturing process; (7) the MPD could not amend the Code to include the asphalt material in the definition of recyclable material because the MPD only stated that it was an amendment to the zoning ordinance; (8) the environmental control ordinance unambiguously excluded asphalt material from the definition of recyclable material and therefore the material on the site constituted waste and the zoning ordinance and the environmental control ordinance could not be read *in pari materia*; and (9) the MPD

ordinance provided that any required permits had to be obtained, and therefore the MPD could not be deemed to have waived or altered the requirements of the environmental control ordinance.

Plaintiff also argues that the injunction was appropriate for reasons other than the alleged violation of the ordinance prohibiting the dumping of waste: (1) defendants did not obtain a recycling license; (2) in violation of the MPD, the waste covered more than 50% of the site; (3) defendants stored some material for more than 60 days; and (4) defendants unlawfully stored the asphalt roofing on the ground instead of in receptacles. But these arguments were not raised below and therefore were waived. (*Harbor Insurance Co. v. Arthur Andersen Co.* (1986), 149 Ill. App. 3d 235, 240, 500 N.E.2d 787.) The motion for an injunction alleged only the violation of the ordinance prohibiting the dumping of waste.

■■ ■ Section 11—4—120 of the Environmental Protection and Control chapter of the Code defines recyclable material to mean:

"any aluminum or nonferrous scrap, bimetal or tin cans, glass and paper products, rubber, textiles, wood, landscape waste or plastic products such as polyethylene terphlate, high-density polyethylene, low-density polyethylene, polystryrene or polypropylene." (Chicago Municipal Code §11—4—120 (1990).)

The section also defines waste:

"any discarded or abandoned material in solid, semisolid, liquid or contained gaseous form, including but not limited to, industrial process waste, hazardous waste, municipal waste, special waste, garbage, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility." (Chicago Municipal Code §11—4—120 (1990).)

"Municipal Waste" is in turn defined as:

"garbage, general household and commercial waste, landscape waste and construction or demolition debris." (Chicago Municipal Code §11—4—120 (1990).)

But waste excludes:

"(1) Sewage collected and treated in a municipal or regional sewage system; or

(2) Recyclable materials ***." (Chicago Municipal Code §11—4—120 (1990).)

The chapter provides for a permit for the operation of a sanitary landfill. Chicago Municipal Code §11—4—120 (1990).

Chapter 4—248 of the Code, which regulates recycling facilities, provides that no person shall engage in the business of recycling or shall operate a recycling facility without a license. (Chicago Municipal

Code §4—248—020 (1990).) The chapter's definition of recyclable material is virtually identical to the one quoted above.[1] The chapter prohibits the storage of recyclable materials at any recycling facility for longer than 60 days. (Chicago Municipal Code §4—248—120 (1990).) There is a provision that states that nothing contained in the chapter applied to the recycling or recovery of waste materials by a manufacturer for reuse in a manufacturing process. Chicago Municipal Code §4—248—150 (1990).

■■ We hold that the materials stored at the ARS site fall under the definition of waste given in the environmental control ordinance. The material was of the type covered by the definition of waste and not of the type covered by the definition of recyclable material. The material was discarded by the waste haulers, and therefore the fact that the waste now belonged to defendants did not convert the material from waste to nonwaste. Although the MPD specifically stated that asphalt material was considered recyclable, the MPD did not amend the environmental control ordinance, which is a separate ordinance with its own definitions. The MPD ordinance changed the zoning of the property to permit as a use of the property the operation of an asphalt recycling facility, but applicable licenses still had to be obtained in order to actually operate the facility. We do not determine which type of license defendants required, but, without a permit either to dispose of waste or to recycle, it appears defendants were operating an illegal waste dump. Defendants allowed the open dumping of waste and, on that basis, the preliminary injunction was properly issued.

The judgment of the trial court is affirmed, and the cause is remanded.

Affirmed and remanded.

GREIMAN, P.J., and RIZZI, J., concur.

---

[1]The only difference is that the definition includes nonferrous scrap *metal* and polyethylene *terephtate* (instead of *terphlate*).